May it please the court, Martin Buchanan appearing for appellant Eldridge Payne. I would like to reserve a few minutes for rebuttal. This is an appeal from a summary judgment ruling in favor of the County of Orange on a claim of liability under Monell v. Department of Social Services. Our theory of liability against the county is that certain customs and practices of the Orange County Sheriff's Department deprived Mr. Payne of his constitutional right to protection from assault by other inmates, which resulted in a 15-minute beating by 10 inmates that broke Mr. Payne's neck and paralyzed him from the waist down. Mr. Buchanan, my understanding is that the bulk of the evidence that you're relying on in order to establish what those customs and practices were are found in the grand jury's special report that was issued after the unfortunate beating of your client. And I guess the first hurdle we have to overcome is the district court's decision on summary judgment to exclude that report on grounds of relevancy. All right. Let me address that relevance issue. I mean, am I right that that's a key component of the proof in support of your Monell claim? I think it's fair to characterize it as a key component. I think it also is the bulk of the evidence of the customs and practices. It is, however, not the only evidence, so I will hope to address the other evidence as well. The reason that Judge Tucker got it wrong in finding that the DA investigative report was irrelevant is that that investigative report goes to the very issue that we must prove under Monell. Under Monell, we must prove that the customs and practices that we are relying on are sufficiently pervasive and widespread within this particular governmental entity as to ---- In this particular governmental facility, as I understood, one of the grounds that the district court cited was the concern that the report dealt with the tragic death of Mr. Chamberlain in a different jail facility. Correct. Right? Correct. And I guess that death had occurred some months before your client was assaulted. Four months before. Okay. Involving different personnel, different commanders, that sort of thing. That's true, Judge Tallman. But the point under Monell is we have to show that the practices are widespread within the particular governmental entity that we're talking about. Right. Your argument is that a jury should have been able to reach the inference that if the other facility, the Theo Lacey facility, was run that way, then the men's central jail must also have been run in exactly the same way. Combined with the evidence that we have that the men's central jail was run in the same way. Correct, Your Honor. I mean, it's not just the Theo Lacey evidence that we have. We have evidence that those same practices were also followed in the men's central jail. But the district court also cited the fact that to the extent that that report came out after the assault on your client, it couldn't have put the responsible county officials on notice prior to the time that Mr. Payne was assaulted. Well, first of all, I think it doesn't matter whether the responsible policymakers knew of that custom. That's what this Court held in Thompson and, again, in Navarro v. Block, where the Court said, and I'm quoting from Thompson, a local government may be liable for its custom, irrespective of whether official policymakers had actual knowledge of the practice at issue. But you still have to show deliberate indifference, do you not? Yes. That has to be the result of the application of the policy. And so, as I understood the district court's reasoning, what she was saying was it's essentially a failure. Without that report, it's a failure of proof in the plaintiff's claim to establish sufficient evidence to show that the officials who were running the men's central jail had sufficient warning, if you will, that that was the custom and practice and, therefore, were deliberately indifferent to Mr. Payne's situation. Well, first of all, again, I don't think the responsible policymakers have to have actual knowledge of the custom under Thompson. But with respect to deliberate indifference, what this Court's cases say is that the municipal policies or customs themselves must amount to deliberate indifference. And I would cite the court, the en banc opinion in Redmond v. City of San Diego, or rather, County of San Diego. That's a case, Your Honor, that is, well, factually a little different. It is similar to the- Well, part of the problem is it involved the same facility, right? Not as- In fact, we're talking about one jail facility where the assault on the inmate occurred in San Diego, in Redmond. That was one jail facility, yes. Right. A single jail facility. Right. But the question, I mean, there wasn't any question that the same policies applied because there was testimony by the officers who ran that facility as to why they did or did not segregate violent sex predators from more vulnerable inmates. Right. The point I was trying to make went to your question about deliberate indifference. And what the court in that, what the en banc court in that case said is that there were two customs or policies that were being followed. One was at that particular facility, as Your Honor points out, there was a custom of isolating homosexual inmates, but then transferring so-called aggressive homosexuals into the mainline population. That was kind of a de facto policy that was not followed at other facilities. And then there was a policy of overcrowding. But on the point of deliberate indifference, what the court said was that these policies themselves amount to deliberate indifference. And that's the language that's used in cases like Gibson and Berry v. Baca. But just a minute. Gibson says that the plaintiff must show that the county was on actual or constructive notice that its omissions would likely result in the violation in order to show deliberate indifference. Well, I think Gibson does it right. I mean, that's why it seems to me that what we're really saying here, the report was not published until after the injury does have some significance in the district court's determination. Because of what a Gibson's were when Gibson, we said, has got to have actual constructive notice, how would this report have been any notice to them if it wasn't even published until after he was injured? Let me make two points about that, Judge Smith. Number one, I see some tension. Gibson does hold that. You're absolutely right. I see some tension between Gibson and the quote that I read you from Thompson, which was also repeated in Navarro. And I'm not quite sure, frankly, how to reconcile those cases. Because Thompson and Navarro say plain as day, the government policymakers need not know about the custom. So, frankly, I'm a bit at a loss to know how to reconcile those cases. But assuming Gibson ---- Here's my problem on this particular thing that we're discussing now as to the report. Exclusion of evidence in a summary judgment motion in this particular situation is on abuse of discretion. So I'm talking about something that's implausible, impossible almost. And I'm just going to say that the district court first had described, and I'm just reading what they said, it described circumstances in another facility, not this one. There's no evidence that any of the defendants worked at the Theo Lacey facility. No evidence Theo Lacey was built similarly to Men's Central. No admissible evidence that policies, procedures, or customs in Theo Lacey were similar to these. And the report was not published until after the plaintiff was injured. Now, I'm saying to myself, I can't say that's implausible. So how is it an abuse of discretion to throw out the report? Okay. Let me go through each one of those points that you just quoted. I mean, we got to the one where I was really talking. The report wasn't published. Certainly looks like from Gibson it wouldn't have had much to do. Well, certainly the policymakers at the Orange County Sheriff's Department were aware of the Chamberlain beating before this report was published. And they would have been aware of the circumstances surrounding the Chamberlain beating in which an inmate died. Obviously, the Orange County policymakers knew Mr. Chamberlain was beaten and killed in an open court. And you say it's implausible. I'm saying, and I'll go through each one of these, because I think each one of these is an abuse of discretion, particularly the most critical one where she says, Plaintiff also failed to submit admissible evidence that the policies, procedures, or customs in the Theo Lacey facility were similar to those in the Orange County Men's Jail. That is simply not correct. That is totally implausible. We submitted evidence of the failure to monitor inmates in the Orange County Central Jail where deputies were not following written procedures as to regular checks on the inmates in these dormitory housing units. We also submitted evidence regarding the existence of inmate shock collars and reliance on inmate shock collars in the Orange County Central Jail. We submitted evidence regarding the mixing of serious felons with non-serious, in my client's case, misdemeanor inmates in an open dormitory setting without any real monitoring for hours and even days on end. If I review the evidence, and I'm just stopping you in the middle of your thought, and I didn't mean to, but I guess I did mean to, there seems to be no question that the deputies were aware that the inmates had selected for themselves a rep or a shock collar. What evidence do I have that the deputies relied on that person to discipline others? Well, there's a testimony of inmate Michael Croning, which we submitted. Well, Croning says shock collars and reps do punish, but I guess I'm trying to figure out what evidence is there that the deputies relied on that person to punish. Mr. Croning cited two specific incidents, one he had personal knowledge of, the other he did not. The one he had personal knowledge of was an incident when an inmate was, quote, unquote, being bad in the chow hall, and he personally overheard a deputy call out one of the shock collars and tell him that person needed to be taught a lesson. He says he overheard that discussion, and this was in the period of time he was an inmate at the Men's Central Jail during 06 to 07, he says during the first two months, so it would have preceded probably both the Chamberlain and the Payne incident. And then he also overheard regarding another similar incident. So that's exactly the type of use of ‑‑ deliberate use of inmate shock collars to inflict discipline that is documented at length in the DA investigative report. And the DA investigative report doesn't say this is an isolated thing. It says this is a routine use of shock collars within the Orange County Sheriff's Department at the Theo Lacey facility. It says it is a ‑‑ refers to it as a practice, a practice that numerous deputies followed. So we have evidence that this practice was not limited to the Theo Lacey facility, that it extended to the Men's Central Jail. And the fact that it's a different facility supports our argument that it's a pervasive, widespread practice of the sort that we must prove under Monell. The fact that it's different facilities, different deputies, that helps us. That makes it more relevant. That doesn't make it less relevant. That makes it more of a widespread practice. So that's why I think Judge Tucker got it wrong when she said that this report was completely irrelevant. It was relevant to show a widespread practice throughout the Orange County Sheriff's Department that operates both these facilities. It's a single unit of command there. And so I just think in terms of whether a jury could find that this evidence supports the existence of a widespread practice or policy that contributed to this beating, surely a jury could look at that report combined with the evidence of similar practices at the Men's Central Jail and say, yes, there were widespread practices regarding deficient monitoring, regarding the deliberate use of inmate shock collars to inflict punishment, which the deputies knew included assaulting other inmates. Mr. Buchanan, I think the problem I'm having with your argument is that it's a bit circular in the sense that it sounds to me like you really need that report. And if we conclude, applying the standard of review, that the district court did not abuse its discretion in excluding it, what I heard you say in response to Judge Smith's question was that you have testimony by this inmate croning as to one or two incidents, and then perhaps some testimony from a deputy that, yes, we knew there were shock collars or representatives in the jail, but very little else because the rest of it's in the report. And I guess the question is, in a jail that runs 60,000 inmates a year through these facilities, is that enough without the report to establish a custom or practice under our precedent? Judge Tolman, probably one or two incidents on their own would not be enough. I do think we have other evidence regarding monitoring in the men's central jail that is a little more than one or two incidents because there and it's the same inmate who gives the testimony about that, but there he testifies for the entire period that he was incarcerated in 06 to 07 in the men's central jail, there really was no regular monitoring, especially on weekends. And this incident did occur on a Sunday. He says on weekends there was essentially nobody checking the jail. There was nobody walking through. He says the deputies, the number of times that he saw deputies walking the catwalk to look into the tanks was about, I believe he said, once every three months. And so what Farmer says is that the government and its officials are not free to simply lock away inmates and let nature take its course. And that evidence, that testimony supports the inference that that's essentially what was going on, not only at the Theo Lacey facility but also at the men's central jail. How many deputies are assigned to the men's central jail on a watch? Did you discover that? The evidence about how many deputies are assigned is limited to this module. This module is- We don't know how many sheriff's officers were assigned to the jail, let's say on the day shift on whatever day it was that Mr. Payne was assigned. No, there's no evidence on that particular point in the record. The evidence in the record is- All we have is just for this module. This module, which consisted of six tanks, capacity 244 inmates, including two of these dormitory-style tanks. There was a single module deputy who was responsible for monitoring all of those six tanks, 244 inmates. And his responsibilities included not only monitoring but transportation and various other duties involving paperwork. And he was positioned in a manner such that he simply could not observe the interior of these dormitory tanks. There were no surveillance cameras that could observe the interior of these dormitories. I thought there were some, but there were gaps, and the inmates knew where the gaps in coverage were. There was a surveillance camera in the day room, but the surveillance camera in the day room of Tank 21 did not show the living area where the bunks were, where this beating took place. There were cameras, but your argument is that there were an insufficient number because there were dead spots that were known. I'm not sure it's a dead spot so much as a- A blind spot. I wouldn't call it a spot. My understanding from the record is there's the day room that does have the surveillance camera, and there's the living area with the bunks that is simply not- That has no cameras. That's my understanding, yes. I can see I'm running- The reality is that the surveillance camera in Tank 21, there is one, but it doesn't provide a view of the dormitory area. That's my point. Isn't that the question? Yes, of course. Yes. Judge Benson has a question. Sure. In the record, the district judge found there is ambiguity in Mr. Williams' expert testimony declaration, and one of those was an ambiguity. He mentioned that he had worked at the men's jail, right? Men's Central Jail. Correct. And the district judge said here, for example, Williams states that he worked in the Men's Central Jail, but it appears that he may be referring to the L.A. Men's Central Jail, which is not at issue in this case, rather than the Orange County Men's Central Jail. It's the location of the altercation. That's a direct quote. Was there any effort by the judge to clear that up, or was the judge just saying because the declaration is ambiguous, that's another reason I'm not going to allow this person to testify? There was no effort by the judge to clear that up, and the only such effort would have been at the hearing on the summary judgment motion. Was any effort made there? Was there any? That seems to me to be a fairly significant thing. Or did you think so? My understanding is that he worked at the L.A. I mean, he was the former chief of the L.A. Only the L.A. County. Correct. At their Men's. At their Men's Central Jail. He didn't have any personal familiarity with, I mean, like many experts. With Orange County. With Orange County. Like many experts, he just relied on materials that were provided to him, and not only that, he visited the facility in question, read all the depositions. So he didn't have personal familiarity with the Orange County Men's Central Jail is my understanding. And, again, he was provided with a copy of the grand jury's special report. Yes. And relied heavily on it in formulating his opinion. Correct. Okay. But the district court said I can't tell how much of his opinion is driven by what he learned from the excluded evidence, right? Right. And there again, that's correct. That's what the district court held. But there again, what Chief Williams was testifying to was that these practices posed an unacceptable risk to the inmates within these dormitories. I understand, but his opinion is driven, as I understood, state of the record, in part, I think probably a significant part, by what the grand jury said in the report. Right. But my point is, surely the fact that an inmate got beaten and killed in an open dormitory setting where serious and non-serious felons were mixed together supports Chief Williams' opinion that this practice poses an unacceptable risk to the safety of the inmates. We're back to the concern that I was asking you about before. So whether one or two incidents is enough in a jail, actually jails of this size, handling this number of inmates. I mean, surely the law cannot be that the mere fact that you have an inmate injured or an inmate die in a jail, as a matter of law, establishes an illegal custom or practice that violates civil rights under Section 1983. No, but, Judge Tallman, I think the danger is so obvious in this case. With all due respect, I mean, you've got serious felons mixed in with misdemeanor offenders in a dormitory with easy, unrestricted access to one another. And the deputies are turning their backs on them and letting anything happen happen, knowing that discipline is being enforced by a quote, unquote, shot caller, and that the means of exercising that discipline includes assaulting other inmates. Okay. I think we have your argument in mind. You're well over your time. Let's hear from the county. Thank you. Thank you, Mr. Buchanan. May it please the Court. I'm Shell Harrell here for the County of Orange. Although they don't say so, what plaintiffs are effectively arguing for is a theory of strict liability when a jail houses an inmate. And what they have here is a failure of proof. I just thought they were arguing that they didn't get to go to trial. Doesn't this all hinge on the fact that they didn't get their evidence in? Your Honor, it does. It was a failure of proof on the plaintiff's part. And the rules of evidence have a very easy standard, the rules of evidence for relevance. It has to just have any tendency to make any fact of consequence more likely than it would be without the evidence. Right? Yes. So how did the judge make a decision that you can support that this evidence wasn't relevant? The only evidence they had was this investigative report, really good evidence, investigative report, and they hired an expert, 35-year police officer, I understand the chief of police in L.A. County. And they say this is great evidence, another incident in the same county with, we've got to assume, similar kinds of culture between two jails. We need this evidence. And the judge just said it's not relevant. How can you sustain a not relevant finding? Your Honor, I think it can be done as follows. The trial court was aware, as this court should be, Orange County has 3 million individuals and 60,000 inmates passing through five jails every year. Plaintiff came in speaking about one jail, one of those five, not the jail where plaintiff was actually held. It would be akin to someone coming in here, to use a federal analogy, I suppose, it would be akin to someone coming in and saying that because things happen in Leavenworth the way that they do, that must mean that they happen in all federal jails the way they do in Leavenworth. That's what plaintiffs were saying. And they are completely separate jails run by completely different individuals. And I have a hard time swallowing that because, as your opponent just pointed out, there was other information showing a large number of similarities, including a significant one about both of these facilities in the same county. Housing, two things, housing violent offenders or convicted felons with people awaiting trial, and that you had this practice, just a coincidence, I suppose, in the same county of shot callers and inmates taking care of discipline within the jails. And I could go through other aspects of this investigative report that dealt with the earlier death that are more than saying San Quentin is like whatever else you said. It seems like a fact finder could listen to that and listen to all of the dissimilarities, but also listen to the fact that it's in the same county and it's remarkably similar allegations of misconduct in both places, deputies sleeping in their office, places where you don't have cameras, letting inmates take care of their own discipline, dead spots. You got one inmate killed. You got another one paralyzed from the waist down. Why shouldn't a trier of fact at least be entitled to hear that evidence? And the judge just says it's irrelevant, didn't even go to Rule 403 to say it's going to be a waste of our time or it's going to be confusing. And when the judge threw out that evidence, the investigative report, then he throws out the expert as well because the expert relied significantly, as Judge Tallman correctly points out, on the investigative report. These people just didn't get a trial. It's not strict liability. They just didn't even get a trial. Your Honor, there was nothing stopping these plaintiffs, this plaintiff, if they felt that they had evidence against the men's central jail and how things are done there to come in before the trial court and show it the way it's always shown, if they have a viable case. Just a minute. Yes. I mean, I'm a little worried about what my good colleague is talking about. Bull says, there's a hierarchical system made up of shot callers and reps as an internal government of the jail. It empowers the inmates to lay down the rules as to how they're going to conduct themselves or handle whatever business they're doing within their living quarters. Payne says, when I got there, I was given a bed and mattress, but I wasn't assigned a bunk. The black rep told me where to sleep. After the altercation, it was the black rep who made the arrangements to go to a new bunk. Koning says, two occasions I saw deputies instruct the shot callers and the reps to enforce discipline on inmates who had disrespected the deputies. In Module D, made up of four tanks, two deputies supervised roughly 244 inmates, the deputies away from the office due to administrative difficulties. There was to be a walkthrough every hour. It didn't happen. Only when the deputies felt like it. Kroning says, very seldom saw a deputy on the catwalk. In this case, it was supposed to be performed at two and was, then it wasn't performed again until after four. Deputy Bella says, walkthroughs unscheduled never happened. No assistance unless requested. Surveillance tank in tank 21 doesn't even give us a view of the dormitory area. Now, it seems to me that when you've got all that evidence stocked up, and that's what I'm doing looking at evidence, I'm having a tough time with why this isn't a, we ought to have a trial. Even if we throw out the report. Your Honor, I mean, I've got it. Why not have a trial with all this in there? Your Honor, because plaintiffs were unable to show that all of their criticisms, and they had many, led somewhere that would have shown deliberate indifference on the part of the county. Where are the deaths? Where are the paralysis in the men's central jail? It's not there. And it's not because they didn't do the discovery. They tried. But they had nothing to present to the district court that would support the notion that county management was deliberately indifferent to known problems in the Orange County Jail. 60,000 inmates through there a year, and they came up with one death. Very sad. They came up with their own client paralyzed from the waist down. Again, our condolences to him. Very sad. He has a great case against the inmates that attacked him, but the Orange County, he has no case there. Well, didn't Koenig, going to deliberate indifference, didn't Koenig say he witnessed three incidents of violence every two weeks? Deputy Horner said at least two altercations had to be broken up. Deputy Bella said difficult to track who the reps were because they fight so much. Had understaffing problems. There were no logs to make certain that random walkthroughs occurred. No adequate surveillance. Doesn't that lead to at least a question of fact as to deliberate indifference? Your Honor, it does not with respect because it never added up to something. It never showed. They never came in with injuries. They never came in saying there have been, I don't know how many that you would need, inmates of 60,000 coming through to show the type of well-settled, persistent problem that courts, this court has required in order to allow a Manel claim to go forward. One or two acts will not do it. They need to come in, and they needed to come in with the Men's Central Jail and show that these problems that they point to had led to something, that there had been deaths, there had been injuries, and they didn't show it. What they came in with was a report showing one death in a completely different jail. That doesn't show anything with regard to the Men's Central Jail. Is it true that in this situation that the plaintiff did not even report his earlier altercation? Your Honor, that is another problem with the plaintiff's case, is that the plaintiff in his own mind, I asked him in the pretrial phase, why did you complain? There are procedures in the Men's Central Jail that were never invoked. If someone is fearful and someone is afraid, Ninth Circuit opinions are read. That training is implemented. If there is a problem, it was incumbent on the plaintiff to speak up, and he didn't. And I asked him why. And he very candidly said, because I didn't know anything was going to happen. Well, if you didn't know what was going to happen, how are we supposed to? Is it also true that the plaintiff was uncertain that any deputy even saw the altercation at lunch? Your Honor, they had no proof on that point, just speculation. And if I can, and more is needed to convene a trial on a Section 1983 case alleging systemic problems with one of the largest local jail systems in the nation. If I can turn briefly to the declaration by Mr. Williams. What I was struck by was the vagueness of what he was saying. He makes broad, vague, sweeping statements that are very much akin, if I can use another federal analogy, of someone coming before this Court and saying, I've read the entire record. I will now submit a brief that has no record sites. He didn't say where he got his information from. He just made, all that we can tell is that he used to work for the LA County Sheriff's Department many years ago. He walked through the Men's Central Jail once, years after the incident in this case happened, and he read the grand jury report. And he also says, I've read all the files and records in the case. Cite something in your declaration that indicates a problem in the Men's Central Jail. Show us the deposition site. Show us the interrogatory site. Show us something. But he just makes broad, sweeping statements that nobody can tell where they came from. There's no record site. And so in that type of environment, the Federal Court judge was entitled to disregard what he had to say. Plaintiffs ---- But you may now be just as conclusory as you say he was. I'm reading, there are no cameras or other video equipment in the tanks or dorms to observe behavior that is occurring in the module. And you say that's too general. That's not as specific. Because he didn't give us more specific square footage readings? Really? The Men's Central Jail reconfigured one of its modules to include a dorm without repositioning the module deputy so he or she can monitor the dorm. That's specific. What do you want from him? And what happened to trials? You say this isn't enough evidence on a Monell claim. I'm still trying to understand why not, unless we confirm that this was permissible to exclude this evidence as irrelevant. Irrelevant. It's like a goldmine, it would seem to me, to a plaintiff. That, well, we've had a paralysis from the waist down. We'd like to take this case to trial against the county because we do think they're deliberately indifferent to a widespread practice or custom. Do we have anything? Well, yeah, we have a grand jury investigative report from an incident that's remarkably similar in another one of their men's jail facilities where you do the same kinds of things, it appears, and look at this report. Now, do we have anything to match up to that? Yeah, we've got Koning, or whatever his name is, and we've got some other testimony, for all I know, and I don't know the record well enough, but from the plaintiff himself and others. And we've got an expert who's willing to come in here and put his under oath, his opinion on the line that this is a problem with the county, and what's the plaintiff told? No, that's not good enough. You don't get a trial. You just, you're finished. Your Honor, I think the trial court was entitled to ask, where is your evidence with regard to the jail that this incident happened at? It would be akin to someone saying, well, both the Tenth Circuit and the Ninth Circuit are both federal courts, therefore what happens in the Tenth Circuit must indicate the workings of the Ninth Circuit. It's just two completely separate organizations and structures. You chose that on purpose because you know that I know that's not true. I looked you up before I came here. There are dissimilarities. I'll give you that one. I don't know that that's a fair comparison. Well, it was fundamentally irrelevant for plaintiffs to come in talking about, by analogy, one circuit, one jail, when the issue was what's- You really mean fundamentally irrelevant? I do. I do because in the pretrial phase, plaintiffs had their opportunity to gather- Do you know how hard it is to prove one of these cases? Your Honor, shouldn't it be hard? Jails are a tough job, as this court, as the Tenth Circuit has said, and lawsuits are waiting around every corner. And their lawsuits are available, but it is a high standard, and it should be a high standard. If they can show that the officials of the Men's Central Jail in Orange County knew that they were set up in such a way that people were getting hurt, that people were dying, and they can show that by actual concrete events in the Men's Central Jail, then they've got a lawsuit. But it just did not happen in this case. And I will submit the reason why they couldn't show it is because the evidence is not there. They're good lawyers. They fought and they tried in the pretrial phase, and they got what there was to get. They brought to this court and to the trial court what they have. It just is not enough. Okay. Thank you very much. Your Honor, thank you. Mr. Kagan, I'll give you a minute on rebuttal. Thank you. I think the Court has made most of the points that I would have made in rebuttal. Just two quick points. Sure. First, counsel keeps emphasizing that there were no prior incidents. We've cited at least four cases in our reply brief in which Monell claims were sustained in the absence of any prior incidents. Those include Redman, Gibson, Blair, and Long. In every single one of those cases, there were no prior incidents. Second, with respect to Judge Smith's question about whether Mr. Payne complained and whether the deputies had knowledge that this was about to happen to him, that's not the issue. Gibson makes that clear. So does Farmer. The issue is not whether there was knowledge that this incident was about to happen to a particular plaintiff, but whether it should have been obvious that these conditions were so dangerous that there was a likelihood of harm to someone in the plaintiff's position, some inmate. And so our point is, these conditions were sufficiently obviously dangerous that there was an extreme likelihood of harm to someone, whether it be Payne or somebody else. And at the very least, we should be allowed to go to trial on these claims and make our respective arguments to a jury. This Court has emphasized in a number of opinions that the question whether a county's policies or customs, events deliberate indifference to constitutional rights is a factual question for the jury to decide. And I submit it should be decided by a jury in this case. Thank you very much. The case just argued is submitted. We are adjourned for the day until 9 a.m. tomorrow morning.
judges: Benson, Tallman, Smith